IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | Case No. 3:10cr108 |
| vs. | : | JUDGE WALTER HERBERT RICE |
| TIMOTHY M. ARRINGTON, | : | |
| Defendant. | : | |

---

DECISION AND ENTRY SUSTAINING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS (DOC. #16)

---

Defendant Timothy M. Arrington ("Defendant" or "Arrington") is charged in the Indictment (Doc. #11) with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 924(c). Police officers discovered the firearms which underlie this prosecution, after the automobile which the Defendant had been driving was stopped and searched by police on June 26, 2010. Defendant has filed a motion requesting that the Court suppress the evidence seized from that vehicle, as well as any statements he may have subsequently made to officers. See Doc. #16. On September 21, 2010, this Court conducted an oral and evidentiary hearing on the Defendant's motion, and the parties have filed their post-hearing memoranda. See Docs. ##22, 24 and 25. The Court now rules on the Defendant's Motion to Suppress Evidence and Statements (Doc. #16),

beginning its analysis by setting forth the facts that were established during the evidentiary hearing.

On June 26, 2010, Officer Richard Sullivan ("Sullivan"), then employed as a police officer by Five Rivers MetroParks,[1] was on patrol in Possum Creek MetroPark, when he observed a vehicle being driven by Arrington turn into a parking area. According to Sullivan, Arrington did not use a turn signal before making the turn. Arrington then turned around in the parking area and drove toward the exit of the park. At that time, Sullivan was looking for a different individual, who he believed was driving despite having had his driver's license suspended. As a consequence, Sullivan did not stop Arrington; rather, the officer continued to look for the other individual.

As Sullivan drove toward the exit of the park, he had given up his search for the other individual. After exiting the park on Frytown Road, Sullivan drove approximately three-quarters of a mile on that road, when he saw Defendant's vehicle parked, with no one inside, in an otherwise unoccupied gravel lot at 5000 Frytown Road. Sullivan and other officers employed by Five Rivers MetroParks Police Department had previously been informed by Montgomery County sheriff's deputies that, based upon the number of arrests, activity concerning controlled substances and prostitution were being carried on at 5000 Frytown Road.[2]

---

[1]Sullivan subsequently resigned from the Five Rivers MetroParks Police Department in order to accept the position of lieutenant with the Grandview Hospital Police Department.

[2]Horse trials leading into Possum Creek MetroPark can be reached from the gravel parking lot at 5000 Frytown Road, resulting in that lot being used to park horse trailers. That gravel lot is also utilized by campers to park when using the Argonne Campsite.

- 2 -

After a few moments, Sullivan observed the Defendant and a female walking up the trial from the Argonne Campsite to the gravel parking lot. Neither Arrington nor the female made eye contact with Sullivan.[3] Since the female had not been in the Defendant's vehicle when Sullivan had observed the alleged traffic violation, the officer suspected that Arrington might be involved in prostitution. After the Defendant and the female had gotten into the Defendant's automobile, but before they could leave the gravel parking area, Sullivan directed the Defendant to pull his vehicle over. Arrington got out of his car and started walking rapidly back to the police cruiser. Sullivan initially ordered the Defendant to return to his vehicle, a command with which the Defendant began to comply. However, almost immediately thereafter, the officer told Arrington to approach the cruiser.[4]

After Arrington had exited from of his vehicle, Sullivan asked him whether he had picked anyone up. The Defendant denied that he had. Sullivan then told the Defendant that he was parked in a horse trailer-only parking lot. During the hearing, however, Sullivan testified that, while the gravel parking lot into which Arrington had pulled was for horse trailers and campers, he conceded that it was lawful for anyone to park in that lot. Sullivan did not mention to the Defendant the alleged turn signal violation he had seen him commit. The officer then asked for

---

[3] A camera in Sullivan's cruiser visually recorded the stop, while microphones in that vehicle and on Sullivan orally recorded same. Government's Exhibit 1 is a copy of the CD of the stop.

[4] Sullivan testified that he believed that Defendant's quick exit from his automobile might have been an indication that he was going to flee. Regardless of Sullivan's suspicions in that regard, the uncontestable fact remains that Arrington in no way attempted to flee during his encounter with Sullivan. Therefore, Sullivan's misplaced suspicion concerning the meaning of Defendant's quick exit from his vehicle is not pertinent to the issues presented by the Defendant's request that the Court suppress the evidence seized from the vehicle he had been driving.

and was given Arrington's driver's license.[5] Within a few minutes, Sullivan had checked out Arrington, using the computer in his cruiser, discovering that his driver's license was valid and that he had no outstanding warrants. Sullivan did not then begin writing a traffic ticket for the Defendant's alleged failure to use a turn signal. On the contrary, Sullivan, accompanied by Arrington, walked to his vehicle in order to obtain the identity of the female passenger and to interview her.

Upon reaching that vehicle, Sullivan asked the female passenger for her identification, which she was not able to provide.[6] She also had difficulty providing Sullivan identifying information, such as her name and the location of her residence. In addition, Sullivan observed what looked like a yellow baggie in her front right pocket, which the officer suspected could be drug paraphernalia. However, Sullivan did not at that point ask the female whether the yellow baggie in her front left pocket was indeed such paraphernalia; rather, as a result of having seen what he suspected could be such, Sullivan returned to his cruiser, once again accompanied by Arrington, in order to call for backup. Sullivan and the Defendant spent the next seven or eight minutes standing around the officer's cruiser, waiting for backup to arrive.[7]

When Sullivan's backup arrived, the officer returned to the Defendant's vehicle, in order to continue his investigation of the passenger and to determine

---

[5]It is not clear from the record when, if ever, Sullivan obtained the registration or proof of insurance for the vehicle the Defendant had been driving.

[6]During the hearing, Sullivan referred to the female passenger in Defendant's vehicle as Tasha.

[7]All the while, Sullivan was interrogating the Defendant about his employment history, his relationship with the female passenger and the like.

whether she had drug paraphernalia in her possession. After Sullivan had interrogated her for approximately six or seven minutes, the female passenger admitted that she was carrying a crack pipe and that she smoked crack. At that point, Sullivan ordered her out of the vehicle and placed her in handcuffs. In addition, another officer searched the vehicle, discovering the firearms which underlie this prosecution in the rear seat, covered by a blanket.

In his post-hearing memorandum, Arrington argues that the evidence seized from his automobile, as well as any statements he may have made to police, must be suppressed, because Sullivan illegally stopped his vehicle. Alternatively, Defendant argues that the Court must suppress same, because officers illegally detained him after stopping him for the turn signal violation. It bears emphasis that Arrington seeks the suppression of his statements only under a fruit-of-the-poisonous tree theory, i.e., that his statements are fruit of his illegal seizure and detention. He does not contend that his statements were involuntary or that there was a violation of Miranda. As a means of analysis, the Court will initially address the parties' arguments in support of and in opposition to the Defendant's assertion that Sullivan illegally stopped his vehicle.

The Sixth Circuit has held that "[a] police officer may effect a traffic stop of any motorist for any traffic infraction, even if the officer's true motive is to detect more extensive criminal conduct." United States v. Townsend, 305 F.3d 537, 541 (6th Cir. 2002). See also Whren v. United States, 517 U.S. 806, 813 (1996) (holding that a traffic stop does not violate the Fourth Amendment, as long as there is probable cause to believe that there has been a violation of a traffic

ordinance, regardless of the officer's subjective motivation for the stop). "Probable cause is a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion." United States v. Blair, 524 F.3d 740, 748 (6th Cir. 2008) (citations omitted). Thus, the Court turns to the question of whether Sullivan had probable cause to believe that Arrington had committed a traffic offense.

Sullivan testified that Arrington had earlier failed to use his turn signal when making a turn. Ohio Revised Code § 4511.39 provides, in part, that "[n]o person shall turn a vehicle ... without giving an appropriate signal in the manner hereinafter provided." That statute gives the driver of a vehicle the option of using hand and arm signals or signal lights. Sullivan's uncontroverted testimony is that the Defendant did not use his turn signal or hand and arm signals. That testimony, if believed, is sufficient to establish probable cause to believe that Arrington had violated § 4511.39. Nevertheless, Defendant argues that the officer's testimony did not establish probable cause, because Sullivan was not a credible witness. In particular, Arrington asserts that, since Sullivan's stated reason for seizing him (Defendant) was pretextual, i.e., his alleged earlier failure to use a turn signal was not the reason he was stopped, he is not credible. For instance, Arrington points to the fact that he was not in his vehicle when Sullivan observed it pulled into the gravel lot. Both pretext and lack of credibility are shown, Arrington contends, by Sullivan's testimony that he would not have waited for the Defendant to come out of the woods, in order to write him a ticket for an improper left turn. Coincidentally, Defendant and the female appeared shortly after he (Sullivan) had arrived in the gravel parking lot. Arrington also points out that, upon stopping him,

- 6 -

Sullivan initially asked him whether he had picked anyone up, rather than discussing the traffic violation which allegedly gave the officer justification for the stop.

As an initial matter, it must be stressed that, even if the alleged traffic violation was a pretext for stopping the Defendant (i.e., even if he stopped him for another reason), that stop was lawful, as long as Sullivan had probable cause to believe that Arrington had failed to signal before making a turn. Whren, supra. However, the Court does not find Sullivan credible concerning Arrington's failure to signal and, therefore, finds that the stop was not supported by probable cause to believe that Arrington had failed to use a turn signal when he had made an earlier turn. In short, the Court concludes that Sullivan's testimony that he had observed the Defendant violate § 4511.39 was not credible.[8] This finding of lack of credibility is supported by Sullivan's own actions. For instance, Sullivan can be heard on the CD, which contains a recording of the stop, telling Defendant that he had been illegally parked in the gravel lot, because it was for horse trailers. As is noted above, Sullivan was not truthful in his assertions to the Defendant that it was unlawful for him to park in the gravel lot. On the contrary, Sullivan conceded at the hearing that anyone could park in that lot. Moreover, nowhere, during the entirety of the stop, based upon the Court's repeated listening to the above CD, can Sullivan be heard to tell Arrington that he had failed to use the turn signal on his vehicle when he had made a turn several minutes earlier. If an officer has stopped an individual for a traffic violation, he will, as a matter of routine, inform

---

[8]In other words, based upon the record developed during the suppression hearing, the Government has not shown, by the requisite preponderance of the evidence, that Sullivan saw Arrington make a turn, without using his turn signal.

- 7 -

the individual of the nature of that violation. In addition, there would have been no reason for Sullivan to tell Arrington that he had committed a parking violation, if the officer had indeed seen the Defendant violate § 4511.39. Accordingly, this Court has found that Sullivan's testimony that he observed Arrington turn his vehicle without signaling, in violation of § 4511.39, was not credible. Without Sullivan's testimony in that regard, no other evidence was presented in support of the proposition that Arrington had committed such a violation. Accordingly, this Court concludes that the stop of the Defendant violated the Fourth Amendment, given that it was not supported by probable cause to believe that he had violated § 4511.39.[9]

As a result of the above findings, this Court sustains the Defendant's Motion to Suppress Evidence and Statements (Doc. #16). Simply stated, the evidence seized from Defendant's vehicle and any statements he may have made to police constitute fruit of the unlawful stop of that vehicle. Although it is, as a result, not necessary to address the Defendant's alternative argument, that his detention after the stop violated the Fourth Amendment, the Court will do so in order to ensure that the record herein is complete.

As indicated, the Defendant argues in the alternative that, even if the stop was supported by probable cause, the subsequent detention of him violated the Fourth Amendment. The Court now addresses that alternative argument, assuming arguendo that the stop was supported by probable cause. An ordinary traffic stop

---

[9]The Government does not argue that Sullivan had probable cause to believe that Arrington and his female passenger had been involved in prostitution.

is analogous to a seizure under Terry v. Ohio, 392 U.S. 1 (1968). See Berkemer v. McCarty, 468 U.S. 420, 438 (1984); United States v. Palomino, 100 F.3d 446, 449 (6th Cir. 1996). In Illinois v. Caballes, 543 U.S. 405 (2005), the Supreme Court held that the Fourth Amendment is not implicated, when a drug detection dog is walked around the exterior of a vehicle, sniffs the car and alerts on it, indicating that controlled substances are located therein, as long as the vehicle was lawfully stopped and the actions of the drug detection dog did not extend the stop beyond the time necessary to write a traffic ticket or warning for the offense which had led to the stop. Therein, the Court also reiterated that "[a] seizure that is justified solely by the interest in issuing a [traffic] ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." Id. at 407. In Palomino, the Sixth Circuit elaborated upon that principle, indicating that, even if the initial stop were lawful, any subsequent detention must not be excessively intrusive. Id. Put differently, once the purpose of the traffic stop has been completed, a motorist cannot be further detained, unless something that occurred during the stop generated a reasonable and articulable suspicion of illegal activity. United States v. Mesa, 62 F.3d 159, 162 (6th Cir. 1993). See also, United States v. Bell, 555 F.3d 535, 539 (6th Cir. 2009) (noting that "[t]o detain the motorist any longer than is reasonably necessary to issue the traffic citation, however, the officer must have reasonable suspicion that the individual has engaged in more extensive criminal conduct" and that "all the officer's actions must be 'reasonably related in scope to circumstances justifying the original interference'") (internal quotation marks and citations omitted); United States v. Hill, 195 F.3d 258, 264 (6th Cir. 1999) ("Reasonable police conduct under such

circumstances is such that any subsequent detention after the initial stop must not be excessively intrusive in that the officer's actions must be reasonably related in scope to circumstances justifying the initial interference.... Once the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot.") (citations omitted), cert. denied, 528 U.S. 1176 (2000); United States v. Torres-Ramos, 536 F.3d 542, 553-54 (6th Cir. 2008) (noting that "once the purpose of the traffic stop is completed, a police officer may not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention") (internal quotation marks and citations omitted).

Herein, the Defendant argues that Sullivan illegally extended the stop, by seeking identification information from the female passenger, without reasonable suspicion to believe that she was engaged in criminal activity. As is recounted above, after obtaining Arrington's driver's license, determining that it was valid and ascertaining that the Defendant had no outstanding warrants, Sullivan proceeded to the Defendant's vehicle in order to obtain such information from the female passenger, rather than writing a traffic ticket to the Defendant for failure to use a turn signal. Sullivan was unable to obtain a form of identification from the female passenger, and she was not entirely clear on her identity and the location of her residence. In addition, Sullivan saw what looked like a yellow baggie in her front, left pocket, which he suspected to be drug paraphernalia. According to the Government, those facts, when coupled with the information Sullivan had received

- 10 -

from the Sheriff's Department concerning drug activity occurring at 5000 Frytown Road, constitute reasonable suspicion to believe that the female had been involved in activity relating to controlled substances, thus justifying Sullivan's further investigation of her.

In support of its position, the Government initially relies upon a statement the Supreme Court made in Arizona v. Johnson, — U.S. —, 129 S.Ct. 781 (2009), to the effect that an "officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." Id. at 788. Moreover, as the Government points out, a number of circuits have held that a police officer may ask for passengers' identifying information, even if it is unrelated to the purpose of the traffic stop. For instance, in United States v. Fernandez, 600 F.3d 56 (1st Cir. 2010), the First Circuit applied Johnson and held that the District Court had correctly denied the defendant's motion to suppress evidence. The defendant had been a passenger in a vehicle which was pulled over for a traffic violation. An officer asked the defendant for identifying information and, as a result, discovered that there was an outstanding warrant on him. The officer told the defendant to get out of the automobile and patted him down while arresting him for the outstanding warrant. During the pat-down, officers discovered that the defendant was carrying a firearm. As a result, the defendant was charged with being a felon in possession of a firearm. See also, United States v. Diaz-Castaneda, 494 F.3d 1146, 1152 (9th Cir.) (stating, in the context of a passenger inquiry, that "[t]he police may ask people who have legitimately been stopped for identification without conducting a

[separate] Fourth Amendment search or seizure"), cert. denied, 552 U.S. 1031 (2007); United States v. Soriano-Jarquin, 492 F.3d 495, 500 (4th Cir. 2007) (holding that, "[i]f an officer may 'as a matter of course' and in the interest of personal safety order a passenger physically to exit the vehicle, he may surely take the minimally intrusive step of requesting passenger identification"), cert. denied, 552 U.S. 1189 (2008); United States v. Rice, 483 F.3d 1079, 1084 (10th Cir. 2007) (holding that, "because passengers present a risk to officer safety equal to the risk presented by the driver, an officer may ask for identification from passengers and run background checks on them as well") (citations omitted).[10]

    This Court finds those decisions to be persuasive and fully consistent with the holding of the Supreme Court in Johnson. Therefore, this Court will follow those decisions and, as a consequence, conclude that Sullivan did not violate the Defendant's rights under the Fourth Amendment, by asking the female passenger in his vehicle for identifying information. While in the process of seeking such information, Sullivan observed what he believed to be drug paraphernalia in her front, left pocket. In addition, she had difficulty identifying herself to Sullivan. Those facts, coupled with the information concerning drug activity and prostitution occurring at 5000 Frytown, gave Sullivan reasonable suspicion to believe that she was engaged in activity related to controlled substances, thus justifying further investigation. During that investigation, the female passenger admitted that she used crack cocaine and that she had a crack pipe in her front, left pocket. As a consequence, Arrington's vehicle was searched, and the firearms which underlie this prosecution were discovered.

---

[10]The Sixth Circuit has not addressed the issue.

- 12 -

- 13 -

Based upon the foregoing, the Court rejects the Defendant's assertion that his detention, assuming <u>arguendo</u> the propriety of the initial stop, violated the Fourth Amendment; however, given that the Court has concluded that said stop of his vehicle constituted a constitutional violation, the Court sustains the Defendant's Motion to Suppress Evidence and Statements (Doc. #16).

January 14, 2011

                                              WALTER HERBERT RICE, JUDGE
                                              UNITED STATES DISTRICT COURT

Copies to:

Counsel of Record.